UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

UNITED STATES OF AMERICA          19 Cr. 144 (AKH)
      v.
ALEJANDRO MARIN,
          Defendant

_____

SENTENCING SUBMISSION ON BEHALF OF ALEJANDRO MARIN

                                  KELLEY J. SHARKEY
                                  26 Court Street, Suite 2805
                                  Brooklyn, N.Y. 11242
                                  Attorney for Alejandro Marin

**BACKGROUND**

Alejandro Marin was born and raised in Venezuela under middle class circumstances. He is one of six children born to Alejandro Jesus Marin and Rose Marin Aigster. His father was a merchant sailor, a teacher, and Director of the Nautical School of Venezuela. The family were strict Catholics. Mr. Marin has five siblings, two sisters still reside in Venezuela. One of his sisters requires financial assistance for living and medical expenses, which he supplied until the time of his arrest. He worries constantly about his sisters survival in Venezuela due to the country's financial instability.[1] He is also greatly concerned about their safety in light of his cooperation with United States law enforcement - he blames no one but himself for the attention his illegal actions have generated.

Mr. Marin earned a Bachelor of Sciences degree in a High School in Carracas. Mr. Marin met his wife, Maria Alejandra, when he was in the ninth grade and married her in 1994. His father in law was a successful airline pilot for businesses in Venezuela and Africa. He became Mr. Marin's financial sponsor in the airline field. His father in law also helped Mr. Marin pay for his education (flight school and proficiency in English) in the United States. In 1998 Mr. Marin brought his wife and two young children, who were born in the United States, back to Venezuela. His return to his home country coincided with the rise of Hugo Chavez, the elected president. Chavez launched the "Bolivarian Revolution" that included a new constitution, social policies

---

[1] The United Nations estimates that 25% of the population are in need of humanitarian assistance and 96% of Venezuelans live in poverty. Daily water and electricity are increasingly unavailable and news reports display Venezuelan using open water in the street for bathing, cooking, and drinking. Only 60% of chilldren attend school regularly due to the lack of food, water, electricty and transportation.
https://ge.usembassy.gov/how-maduro-has-destroyed-life-inside-venezuela/

funded by high oil prices, and increasingly anti-US foreign policy.[2]  President Chavez' socialist policies caused  massive rumblings and demonstrations as he passed laws to redistribute land and money. In this climate jobs were difficult to find.  Mr. Marin was able to find work as a pilot because of his fluency in English and his resident pilot license obtained in the United States. His family settled in the U.S. in 2003.

In 2013 Mr. Marin started his own company - "My Jet Saver". In 2015 he used his life savings to to buy a FAA 135 Certification which allowed him to charter aircraft.  Without the benefit of legal counsel and through an employee of  My Jet Saver, he met with a contact at the Miami DEA. During this meeting he agreed to voluntarily report OFAC (Office Foreign Assets Control) sanctioned persons who were chartering planes he was flying for American Charter Services (ACS), a private jet company owned by Victor Mones Coro.  This collaboration began in 2017.  Mr. Coro's company booked many flights with My Jet Saver, but did not pay for the cost. Mr. Marin's company covered flight expenses that included fuel, landing fees, maintenance etc.  He did this with the knowledge of law enforcement and there was significant demand for flights. ACS did provide payment on some flights but payment  was often delayed . This caused mounting pressure to satisfy the company's operational debts. Eventually, DEA turned the operation over to HSI because HSI investigated and prosecuted sanctions violations cases.

Continued flights under HSI strained the company's resources. It was understood between Mr. Marin and government agents that he was to fly ACS sanctioned persons, collect their charter payments (when they did pay) and forward the payments to HSI.  When working with HSI, certain company expenses were covered and others were not.  He was chronically behind on expenses generated by the company's business. To keep the company afloat, he took funds that

---

[2] Www.bbc.com>world-latin-america-19652436

he was supposed to turn over to HSI.

The money he failed to provide to the government, and the basis for his criminal charges, was largely used for business expenses. Mr. Marin understands it was wrong for him to use the money without HSI approval and wrong for him to lie about it. He takes full responsibility for his illegal and un-counseled actions.

Mr. Marin has two children. His son is married, works in the biomedical field and lives in Atlanta. His daughter, Maria Marin, is twenty four. She is a college graduate and now the CEO for My Jet Saver. It is a tremendous burden to assume at her young age, but she is working to save the family business and keep the family united. Maria, her brother, and their mother recently traveled to New York to visit Mr. Marin and meet with defense counsel.

It was an emotional meeting and very apparent to counsel that the family is most concerned about the well being of their father and husband. They questioned him about his decision to forgo anxiety and depression medication and feared for his mental and emotional status. I also encouraged Mr. Marin to take medication. His decision not to do so stemmed from his fear of losing his pilot license permanently. Mr. Marin is now **REDACTED**. He realizes the enormous consequences his actions have caused to the people he loves the most. In our meetings he often reflects on how his actions were driven by business concerns instead of protecting his family. He understands that he will likely permanently lose his pilot's license. He discussed the harm he has caused and wishes to make amends.

### Guideline Calculation And Restitution

The defense does not object to the Guideline and Restitution calculations advanced by the government. At the plea hearing on March 24, 2021, the court raised the issue of $547,911.00 owed to the United States government as restitution and directed counsel to "...please go into this

issue, you can give me the law, because it seems to me we are mixing up forfeiture with the restitution" ( March 24, 2021 p. 17).

The defense has been in conversation with the government on the restitution question and agrees that the analysis addressed in *U. S. v. Teodoro Osorio*, 58 Fed. Appx.875, (Feb. 20, 2003), applies in this matter.  In *Osorio*, the Second Circuit found that the defendant was acting on behalf and under the direction of the DEA, when he falsely represented that he had collected $18,000 from a drug dealer when in fact the true amount collected was $85,000. The Court found because Orsorio was acting as an agent of the DEA it was appropriate to order restitution to the government of $67,000 - the amount of money he kept for himself.

18 U.S.C.§3663(a)(2) defines a victim as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered..." The federal government can be a victim under 18 U.S.C.§3663 see *U.S.v. Helmsley*, 941 F.2d 71, 86 (2d Cr. 1991). Then simply put,

> a)  On July 26, 2018, in the course of working as a confidential source, Mr. Marin flew a plane into the U.S. that carried euros which were the proceeds of the sanctions evasion scheme. The labels on the packages carrying the euros indicated a total amount of 1,297,500 euros that were intended to be turned over to HSI.
> 
> b) Before leaving Venezuela with the cash, Mr. Marin allowed Juan Carlos Ferro (a prominent attorney in Venezuela) to remove $547,911.00 U.S. dollars from the package. ( PSR paragraph 24)**.**
> 
> c ) When questioned by HSI, Mr. Marin falsely claimed the money had been stolen by Ferro in Venezuala.
> 
> d) Marin was reimbursed by Ferro for approximately $130,000 U.S. dollars of the money

taken by Ferro and was dishonest with HSI agents concerning this payment.

e) Marin alerted HSI that he had received $130,000 in two payments occurring in January and June of 2019. He was arrested on September 19, 2020.

While it does not excuse the theft, nor does it preclude the government from seeking restitution, it is relevant and mitigating to note that, some of the money at issue would have been returned to Mr. Marin in order to maintain the private air transport company's (My Jet Save) operational capability. The funding of My Jet Saver, necessary for the sanctions evasion investigation, largely came from the violators, only it often didn't. The sanction evaders were notorious for not paying for their flights or delaying reimbursement for flights. The payments by sanction evaders helped fund the HSI investigation. My Jet Saver, the company Mr. Marin maintained, was not the only air travel company involved in sanctions violations and suffering from lack of payment . Often, My Jet Saver was in severe arrears operating on dwindling credit. Mr. Marin's use of the money to pay bills owed on his business operations was an illegal action motivated by his concern for the business. He is deeply sorry for his falsehoods and accepts responsibility for his actions.

**Alejandro Marin asks the Court to Implement the Goals of 18 U.S.C. 3553(a)**

Apart from consideration of departures under the now "advisory" Guidelines, 18 U.S.C. §3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." Section 3553(a)(2) states that such purposes are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

( C ) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the sentencing court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. Other statutory sections also give the district court discretion in sentencing. Under 18U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: <u>in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, a sentencing judge is required to "recognize[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."</u> Under 18 U.S.C. §3661, "[n]o limitation shall be placed on the information concerning the background, character or conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Under *Booker, United States v. Crosby*, 307 F.3d 103 (2nd Cir. 2005) and §3553(a) now make clear that courts must consider all of the factors in 3553(a), many of which the Guidelines either reject or ignore. For example, under 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." Under the Guidelines, however, courts are generally forbidden to consider the defendant's age, U.S.S.G. §5H1.1., his education and vocational skills, §5H1.3, his physical condition including drug or alcohol dependence, §5H1.4, his employment records, §5H1.5, his family ties and responsibilities, §5H1.6, his socioeconomic status, §5H1.10, his civic and military contributions, §5H1.11, and his lack of guidance as a youth, §5H1.12. The Guideline's prohibition

of considering these factors cannot be squared with the 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. See *Simon v. United States*, 361 F. Supp. 35, 40 (E.D.N.Y. 2005). Additionally, in some cases, the Guidelines will clash with §3553(a)'s primary directive: "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

In sum, under *Booker* and *Crosby*, the Guidelines are not binding and courts need no longer justify a sentence outside of them by citing factors to take the case outside the "heartland". Courts are now free to disagree, in individual cases and the exercise of discretion, with the actual Guidelines range, so long as the ultimate sentence imposed is reasonable and supported by reasons tied to the §3553(a) factors. An analysis of the § 3553(a) factors in this case militates in favor of Alejandro Marin and calls for sentence below the Guideline

A. **Sentences Available**

For counts one, two, and three the maximum term of imprisonment is five years per count, 18 U.S.C.§1001. There is no mandatory minimum. The Guideline imprisonment range is 30- 37 months.

B. **The Nature of the Offense and the Characteristics of the Defendant**

The defense would like to incorporate by reference the portions of this submission describing Alejandro Marin's personal history. Numerous friends and family members have submitted testamentary letters on his behalf. Those letters reflect a man who is hard working, kind, and generous. In her letter his wife, Maria Alejandra Martinez Marin, describes the times he assisted in disaster response. In 1999, he transported victims of a landslide in La Guaira, Venezuela from a destroyed town to Caracas in order to receive medical assistance. After returning to the United States to live in 2003, he assisted a charity in bringing toys and clothes to needy children in Venezuela. In 2017, Marin's company planes, numbering ten sorties,

transported medical supplies, clothing, and food to Puerto Rico in the aftermath of Hurricane Maria. He also transported and settled the members of his company and their families in Atlanta, when Hurricane Irma decimated Miami in August of 2017. Mr. Marin is humiliated by his criminal conduct and apologizes to everyone he has hurt by his actions.

C. **The Parsimony Provision 18 U.S.C. 3553(a) Should be Implemented When Fashioning Alejandro Marin's Sentence**

18 U.S.C. §3553(a) requires courts to impose a sentence "<u>sufficient, but not greater than necessary</u>" to reflect the seriousness of his offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training. All of these sentencing objectives could be satisfied by a below guideline sentence and supervised release.

## Conclusion

Mr. Marin has paid dearly for his illegal conduct. He is financially ruined and will likely never again pilot a plane. He respectively requests the Court to temper justice with mercy when sentencing him and consider a below the Guideline sentence.

Respectfully yours,

/S/
Kelley J. Sharkey

cc: AUSA Amanda Houle
    AUSA Samuel S. Adelsberg