

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2021

<u>Via ECF</u>

Honorable Alvin K. Hellerstein
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Alejandro Javier Marin*, S7 19 Cr. 144 (AKH)

Dear Judge Hellerstein:

      The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for July 23, 2021, at 11:00 a.m., on the defendant's conviction of three counts of making false statements to a federal agent, in violation of Title 18, United States Code, Section 1001. In July 2018 – while serving as a confidential human source for Homeland Security Investigations ("HSI") – Alejandro Javier Marin ("Marin" or the "defendant") stole hundreds of thousands of euros in criminal proceeds and then proceeded to lie about his theft several times over the ensuing years. Accordingly, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 30 to 37 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case. The Government also submits that the Court should impose restitution in the amount of $547,911, and a fine within the Guidelines range of $10,000 and $1,095,822.

.

## BACKGROUND

    **I.   Marin's Work as an HSI Confidential Source**

      In or about April 2017, Marin, a private flight services provider, disclosed to U.S Drug Enforcement Administration ("DEA") agents that he and other U.S. persons—including Victor Mones Coro ("Coro")—were providing private flight services to former Vice President of Venezuela Tareck El Aissami Maddah ("El Aissami") and El Aissami's frontman Samark Lopez Bello ("Lopez Bello") in violation of sanctions imposed by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). (PSR ¶ 20). El Aissami and Lopez Bello had been designated in February 2017 by OFAC as Specially Designated Narcotics Traffickers, making it illegal for U.S. persons and companies to provide services (including flight services) to them or receive payment for such services. (*Id.* ¶ 11).

Marin knew Mones through the private flight services business and had previously worked for Mones. (PSR ¶ 14). In November 2017, Marin first met with HSI agents, disclosing that he and Mones were each operating Florida-based companies that provided private flights to Lopez Bello and El Aissami. (*Id.* ¶ 21). Marin identified to HSI other members of the charged conspiracy, including Alejandro Leon Maal ("Leon"), who had worked for Mones, and Michols Orsini Quintero ("Orsini"), who was working for Mones as a pilot. (*Id.*).

Between January 2018 and March 2019, Marin acted at the direction of HSI as part of this investigation. (*Id.* ¶ 22). Marin, for example, conducted recorded calls with Mones and Leon during which Mones and Leon discussed illegal flights. (*Id.*). At the direction of HSI, Marin also collected proceeds of the illegal flights from targets of the investigation in Venezuela and flew that money on private planes into the United States, where the funds were seized by HSI and, in some instances, wired in part to other companies at Leon's direction. (*Id.*). During this time, Marin was regularly reimbursed by HSI for the costs of services he provided to Mones and his co-conspirators. Marin also organized flights for Mones and Leon to and from Venezuela and other international destinations. (*Id.*). Marin's work as a confidential source contributed to the Government's ability to charge Mones, Leon, El Aissami, Lopez Bello, and Orsini, in addition to another Venezuelan official, Joselit Ramírez Camacho, and another pilot for Mones's company, Alejandro Quintavalle Yrady. *See* S5 19 Cr. 144 (AKH).

## II. Marin Steals Funds During July 2018 Cash Transfer

On July 26, 2018, Marin, at the direction of HSI, flew a private plane into the United States carrying several packages containing proceeds of the sanctions evasion scheme. (PSR ¶ 23). The labels on the packages indicated a total of 1,297,500 euros that were intended to be repatriated to the United States. (*Id.*). However, when Marin arrived in the United States, he turned over only 829,200 euros. (*Id.*). HSI agents had previously advised Marin that after arriving in the United States, the euros would be seized by HSI and forfeited by the Government. (*Id.*).

Unbeknownst to the HSI agents, Marin had permitted an associate of his in Venezuela ("Individual-1") to remove money from the packages before Marin flew the euros into the United States. (*Id.* ¶ 24). Specifically, on July 3, 2018, Marin exchanged electronic messages with Individual-1 indicating that Marin had the packages of euros delivered to Individual-1 in Venezuela. Individual-1 then wrote to Marin that a "football partner" associated with Individual-1 needed "100 in cash" that would be paid back to a company owned by Marin in approximately one month. (*Id.*). Marin responded, "you call the shots" and directed Individual-1 to "[g]ive me today's exchange rate and close it with the first ones that you have there." (*Id.*). In these messages, Individual-1 was asking Marin whether he could take money from the packages for an individual associated with a foreign soccer team, and Marin agreed. (*Id.*). On July 25, 2018, as depicted below in both the original Spanish message and translated to English, Marin wrote to Individual-1 that a "package" was "getting done" for Individual-1 in the amount of "514,000" euros. The message also indicated that, after factoring in the exchange rate, the package would have $607,800.

| | | |
|---|---|---|
| 19542257372@s.whatsapp.net AJM (MJS)<br><br>7/25/2018 12:21:26 PM(UTC+0) | Total debt My Jet Saver $601,800 (my commission is already deducted)<br>A bundle [or] package is getting done for you for<br>€514,000<br>€514,000 X 1.17= $607,800 | Deuda total My jet Saver $601,800 (ya restadas las comisiones mias)<br>Se te va hacer un paquete por €514,000<br>€514,000 X 1.17 = $601,800 |

In response to questions from HSI agents in late July and early August 2018 about the missing 468,300 euros (or approximately $547,911), Marin falsely claimed that the money had been stolen by Individual-1 in Venezuela, who Marin said he had entrusted with safekeeping the packages. (*Id.* ¶ 25). In fact, as described above, Marin had consented to Individual-1 taking the packages. At the time, the HSI agents credited Marin's false claim. (*Id.*).

Marin further told HSI agents, in substance and in part, that he believed he could convince Individual-1 to repay approximately $140,000 toward the money missing from the package. (*Id.* ¶ 26). HSI agents instructed Marin to assist in recovering that approximately $140,000, which the HSI agents made clear would then be seized by HSI. (*Id.*). HSI agents instructed Marin to have Individual-1 wire the $140,000 to a U.S. bank account controlled by HSI. (*Id.*). On August 6 and August 7, 2018, Marin told an HSI agent that Individual-1 had attempted to wire the $140,000 in two installments to the HSI-controlled bank account but the wires were rejected. (*Id.*). HSI is not aware of Marin making any additional efforts to return the missing funds to the Government.

### III. Individual-1 Pays Marin Approximately $130,000 in 2019

On January 28, 2019, Individual-1 wired Marin's company $39,955. (*Id.* ¶ 27). On the same day, Marin sent an electronic message to Individual-1 stating, "My buddy, the 40k came in today." (*Id.*). On June 5, 2019, Marin's company received a wire transfer from an organization connected to Individual-1 in the amount of $90,000. (*Id.*). Marin's company, My Jet Saver, also drafted an invoice, depicted below, which delineated services that were not actually provided in order to make it appear as though this was a valid transfer.

[Invoice from My Jet Saver, Invoice #17-2426, Suite 45-20, Opa Locka, FL 33054, Phone # 305-537-9433. Bill To: F.V.F. (Federacion Venezolana de Futbol). Beginning Date: 05-20-2019, Ending Date: 05-22-2019, Invoice Date: 5/20/2019, Tail #: N504JS.

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 10.4 | Falcon 50 LEMD-LPPT-KOPF | 6,500.00 | 67,600.00 |
| 4 | Pilot's Per Diem | 1,000.00 | 4,000.00 |
| 3 | International Overnight Fee | 2,500.00 | 7,500.00 |
| 1 | Fuel Surcharge | 2,100.00 | 2,100.00 |
| 1 | International Landing Fees | 8,800.00 | 8,800.00 |

CitiBank, 1636 Town Center blvd Weston FL 33326 | Bank ABA No. 266086554 | SWIFT Code: CITIU33. Account Name: My Jet Saver | Account No: 9135082055. We Accept all major credit cards. A convinience fee will be added to the invoice (4.5%). We Appreciate Your Business. Sales Tax (7.0...): $0.00; Subtotal: $90,000.00; Payments: $0.00; Balance Due: $90,000.00.]

As detailed below, Marin did not timely disclose that he recovered approximately $130,000 of the criminal proceeds that he diverted to Individual-1 rather than turning over to HSI in 2018. Instead of providing these funds to HSI, Marin lied to HSI on several occasions about being reimbursed for the funds. (*Id.*).

### IV. False Statements in August 2020

In August 2020, including during calls on August 7, 18, 20, 21, 28, and 30, 2020, and a recorded in-person interview on August 27, 2020 (the "August 2020 Interviews"), HSI questioned Marin about his prior claim that the approximately 468,300 euros had been stolen. (*Id.* ¶ 28). During these interviews, Marin provided further false statements regarding Individual-1 and his purported theft of the 468,300 euros. (*Id.*).

In particular, during the August 2020 Interviews, Marin falsely stated (i) that Individual-1 never asked Marin for permission to take money from the packages; (ii) that Marin never provided Individual-1 with cash; and (iii) that Marin never received a reimbursement or any benefit from Individual-1 in connection with the money that was taken from the packages. (*Id.*). On August 28, 2020, Marin called an HSI agent and stated, in substance and in part, that, after further consideration and consultation with his accountant, he now recalled that he had in fact received approximately $130,000 from Individual-1 as reimbursement for the money that was missing from the package. (*Id.* ¶ 29). Marin further stated, in substance and in part, that he had received the approximately $130,000 via two wire transfers in January and June 2019. (*Id.*).

### I. Procedural History

On September 4, 2020, Marin was charged by complaint with three counts of making false statements to a federal agent, in violation of Title 18, United States Code, Section 1001. *See* 20 Mj. 9491.  On September 19, 2020, the defendant was arrested in Miami on the Complaint.  (PSR ¶ 33).  On March 24, 2021, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") to an Information charging him with three counts of making false statements to a federal agent, in violation of Title 18, United States Code, Section 1001. (*Id.* ¶ 5).

In the Plea Agreement, the defendant stipulated that the loss from his criminal conduct exceeded $250,000 but was less than $550,000; that a substantial part of his fraudulent scheme was committed outside the United States; and that he abused a position of public trust and used a special skill in a manner that significantly facilitated the commission or concealment of the charged offenses.  (PSR ¶ 5).  The Plea Agreement included a Stipulated Guidelines Range of 30 to 37 months' imprisonment.  (*Id.*).  Consistent with the Plea Agreement, the Probation Office calculates a total offense level of 19, criminal history category of I, and Guidelines range of 30 to 37 months' imprisonment.  (*Id*. ¶ 95).  The defendant further agreed to make restitution in the amount of $547,911 to the United States in accordance with Title 18, United States Code, Sections 3663(a)-(b), 3663A(a)-(b), and 3664(a)-(o).  (*Id.*).  The Probation Office recommends restitution in the same amount.  (PSR, p. 22).

## DISCUSSION

### I. A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  In particular, the seriousness of the offenses, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of a Guidelines sentence in this case.

The nature and circumstances of the defendant's offenses merit a serious sentence.  *See* 18 U.S.C. §§ 3553(a)(1).  Marin betrayed the trust of several HSI agents and stole a significant amount of criminal proceeds from the Government in 2018.  Then, over the course of two years, he proceeded to lie to HSI agents on multiple occasions in an attempt to conceal his misdeeds. Although the evidence against detained and fugitive defendants in this case remains strong in light of other witnesses and documentary evidence, Marin nearly jeopardized a longstanding transnational investigation targeting individuals providing essential services to Venezuelan President Nicolas Maduro's inner circle in Venezuela.  He only told the truth after HSI agents confronted him in 2020.  The serious nature of Marin's theft, combined with his longstanding lies, deserve a meaningful sentence.

The history and characteristics of the defendant and the need to promote respect for the law also call for a substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A).  Given Marin's significant experience as a confidential source, Marin understood—more than the average

defendant—the importance of being truthful with law enforcement. In fact, Marin was regularly admonished of his responsibility to tell the truth as part of source relationship with HSI. Beyond that, Marin clearly understood the stakes of his duplicity, having seen first-hand how lies, financial subterfuge, and deceit landed Mones, Leon, and others in legal trouble. Despite all of this, Marin brazenly stole money from the Government and repeatedly lied about it. The potential damage caused by these treacherous acts is significant. In trying to capitalize on HSI's trust in him, Marin manifested a deep disrespect for the law and thus deserves a Guidelines sentence.

Finally, the need to afford adequate deterrence to the defendant and others similarly situated also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(B). The Court should send a message that it is unacceptable to steal money from the Government and it is equally unacceptable to lie to law enforcement. Marin's status as a source only furthers the need for such a message given that society's public safety interests require that the Government effectively recruit and employ individuals to serve as confidential sources. It is especially important for these sources to understand that any efforts to betray their handlers or the U.S. Government's trust will be severely punished. To impose a sentence below the applicable Guidelines range would fall short of achieving these objectives and would amount to an insufficient punishment for conduct that caused significant injury to the United States. For all these reasons, society's interest in effective deterrence calls for a Guidelines sentence.

In arguing for a below-Guidelines sentence, Marin principally argues that (i) the money he stole from the Government was meant to keep his business afloat, (Def. Ltr. at 3, 6); and (ii) that he and his family have already paid dearly for his offense conduct, (*id.* at 4, 9).

These arguments are unpersuasive. With respect to the first argument, Marin's explanation for his conduct sheds little light on his disastrous decision to take matters into his own hands, steal from the Government, and then weave together years of lies to cover it all up. As noted above, Marin was regularly reimbursed for his costs by HSI and admonished on several occasions of his responsibility to tell the truth. If his business was indeed in danger of going under because of his work for HSI, Marin had many options available to him short of deceiving his handlers and jeopardizing a longstanding transnational sanctions investigation. And notably, this was no aberration or one-off mistake; it was a pattern of criminal conduct that lasted for years, given Marin's continuous lies. Thus, Marin's supposed motive for his offense conduct should have minimal bearing on the Court's sentencing determination.

The defendant also argues that a below-Guidelines sentence is warranted in light of this case's collateral consequences on himself and his family. (Def. Ltr. at 4, 9). While this is undoubtedly true in the defendant's case, it is sadly the case for nearly all incarcerated defendants and their families. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Furthermore, the unfortunate consequences of Marin's criminal conduct—including that he may continue to be separated from his family and lose his pilot's license—were entirely foreseeable to Marin; no

one else but the defendant made the choices that resulted in him being in this situation. *See United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). Accordingly, these concerns should not carry significant weight in determining the defendant's sentence.

## II.     THE COURT SHOULD IMPOSE $547,911 IN RESTITUTION

The Court should require the defendant to pay $547,911—the amount of restitution agreed to in the Plea Agreement and recommended by the Probation Office—to the Department of Homeland Security. (PSR ¶¶ 5, p. 22).[1] *See* 18 U.S.C. § 3663A(c)(1)(A)(ii) (requiring the imposition of restitution for "an offense against property , . . . including any offense committed by fraud or deceit"). This number reflects both the amount of criminal proceeds Marin stole in Venezuela and the amount of money Marin lied about on several occasions. (PSR ¶¶ 24-25). Put simply, had Marin not stolen $547,911 and then lied about it repeatedly, those funds would have been seized and forfeited by HSI as part of its investigation, along with the other 829,200 euros Marin brought into the country during the cash transfer from Venezuela in July 2018. The Court should therefore require Marin to pay $547,911 in restitution.

Crucially, as the defendant concedes in his sentencing submission, there is no legal bar to the Government being the victim for restitution purposes. The Second Circuit has held that the Mandatory Victims Restitution Act's ("MVRA") definition of "victim" for the purpose of restitution applies to the Government. *See United States v. Ekanem*, 383 F.3d 40, 43-44 (2d Cir. 2004) (holding that the Government may be an identifiable victim for restitution purposes in case involving defendant was convicted of embezzlement of federal funds and intentional misapplication of those funds); *see also United States v. Ritchie*, 858 F.3d 201, 209-11 (4th Cir. 2017) (making false statements in violation of 18 U.S.C. § 1001 was "offense against property" within scope of MVRA because false statement deprived another of property); *United States v. Liu*, 200 F. App'x 39, 40 (2d Cir. 2006) (summary order) (treating bribery-related offense as crime against property because it was committed through corruption or deceit); *United States v. Jaffe*, 314 F. Supp. 2d 216, 223 (S.D.N.Y. 2004) (where defendant plead guilty to violating 18 U.S.C. § 1014 for making false statements to influence the lending determinations of a federally insured bank and thereby obtaining $20 million, restitution was mandatory under MVRA), *aff'd,* 417 F.3d 259 (2d Cir. 2005); *United States v. Nachamie*, 121 F. Supp. 2d 285, 297 (S.D.N.Y. 2000) (where defendants were convicted of, *inter alia,* conspiracy to defraud Medicare, violations were "offenses against property" sufficient to trigger restitution under the MVRA), *aff'd,* 5 F. App'x 95 (2d Cir. 2001).

Furthermore, the fact that the restitution amount is predicated on funds that the

---

[1] During Marin's plea hearing, the Court directed the parties to explain the basis for restitution as opposed to forfeiture. (*See* 3/24/21 Plea Tr.). Title 18, United States Code, Section 1001—which is charged in Counts One, Two, and Three of the Information—does not contain a forfeiture provision.

Government never actually possessed—rather, the amount reflects the criminal proceeds that the Government would have forfeited but for the defendant's theft and deceit—does not prevent restitution here. The Second Circuit decision in *United States v. Osorio*, 58 F. App'x 875, 876 (2d Cir. 2003), is directly on point. The defendant in *Osorio* was a DEA source who falsely told his handlers that he had collected only $18,000 on behalf of a drug dealer, rather than the actual amount of $85,000. *Id.* at 876. The Second Circuit affirmed the lower court's ordering of restitution for the missing funds, explaining its holding as follows:

> We find that the government was a victim because it was "harmed as a result of" Osorio's false statement regarding how much money he had received: If Osorio had told the truth, the government would have received $85,000 rather than approximately $18,000.

*Id.* (quoting 18 U.S.C. § 3663(a)(2)). Here too, had Marin not stolen and lied about the missing $547,911, then the Government would have seized and forfeited those funds. Accordingly, the Court should require the defendant to pay $547,911 in restitution to the Department of Homeland Security.

### III.     THE COURT SHOULD IMPOSE A GUIDELINES FINE

The Court should also impose a fine within the stipulated Guidelines range of $10,000 and $1,095,822 (twice the gross loss of $547,911). (*See* PSR ¶ 104).

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

The offense conduct and the PSR make clear that the defendant is able to pay a substantial fine. (*See* PSR ¶ 90 (detailing a total net worth of nearly $500,000); PSR ¶ 92 (detailing annual income of $826,213 for 2015, $704,828 for 2016, and $311,219 for 2019)). That he stole hundreds of thousands of dollars in criminal proceeds further suggests that he has the means to pay a significant fine. *See United States v. Orena*, 32 F.3d 704, 716, (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine . . . ."). Accordingly, the defendant's financial position, combined with the balance of the Section 3553(a) considerations described herein, warrant the imposition of a substantial fine within the Guidelines range that will serve as not only appropriate additional punishment, but also as a critical component of the general deterrence message resulting from the upcoming sentencing.

### CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration within the Guidelines range of 30 to 37 months' imprisonment, order restitution in the amount of $547,911, and impose a fine within the

Guidelines range of $10,000 and $1,095,822.

          Respectfully submitted,

          AUDREY STRAUSS
          United States Attorney

By: /s/
          Sam Adelsberg
          Amanda Houle
          Assistant United States Attorneys
          (212) 637-2494 / 2194

cc:    Defense Counsel (by ECF)